ROWE. The LEVI. See Cases Nos. 8,293 and 8,294.

## Case No. 12,095.

### In re ROWELL.

[21 Vt. 620; 2 N. Y. Leg. Obs. 285; 6 Law Rep. 298.]

District Court, D. Vermont. 1843.

BANKRUPTCY — DISCHARGE—OBJECTIONS — PREFERENCE—ATTACHMENT—PAYMENT—CONTEMPLATION OF BANKRUPTCY.

1. When a claim against a bankrupt is of a nature to be provable, the certificate is applicable as a bar, and in general must operate as such; but if the plaintiff have a lien by attachment in such case, he is entitled to have judgment and take execution against the property attached. Hence, where a suit has been commenced and an attachment made previous to the filing the petition to be declared a bankrupt, the act of suffering a default in the case does not enable the creditor to gain an unlawful preference. The preference was created by the attachment, and the creditor is legally entitled to the benefit of his lien.

[Cited in Re Reed, 21 Ve. 638.]

2. A payment by a debtor, when it consists of an appropriation of a part, only, of his property, must, in order to bar his discharge as a bankrupt, be made in contemplation of bankruptcy, and be voluntary. To show the payment to be in contemplation of bankruptcy, something more must appear than mere insolvency; and to be voluntary, the payment must originate with the debtor, the first step being taken by him, and not by the creditor.

[Cited in Buckingham v. McLean, 13 How. (54 U. S.) 167.]

3. When a creditor objects to the allowance of a bankrupt's discharge, the question of costs depends upon the particular circumstances of the case, rather than the final result; and although the discharge may be granted, costs will not be allowed to the bankrupt, if it appear, that there was good probable cause for interposing objections, for the purpose of an investigation.

This was an application by Christopher C. Rowell, who had been duly declared a bankrupt on his own petition, for a certificate of discharge; to the allowance of which the following objections were interposed;—1. That Stephen S. Downer, Uriah Wilkins and the bankrupt, being partners in the teaming busi-

ness, and as such becoming indebted to John Downer, he, the said John, in January, 1842, commenced a suit against them, and attached property belonging jointly to the bankrupt and one Jabish Hunter; and at the November term of the court the bankrupt agreed .and consented to a judgment by default in the suit, in order to secure Downer a prefer-ence over other creditors, and for a much larger sum than was due;—2. That the firm of Downer, Wilkins & Co., being indebted to Stephen S. Downer in some small sums, he, the said Stephen S., commenced a suit against the bankrupt at the May term of the county court, and attached his property; that it was understood between the parties, that the suit could not be sustained; and that the bankrupt, with intent to secure the said Stephen S. a preference over other creditors, at the November term of the court consent-ed to a judgment in the suit for an amount equal to the debts he owed the said Stephen S. The third, fourth and fifth objections charged the giving of preferences to certain favored creditors over the general creditors.

PRENTISS, District Judge. The questions to be decided arise upon the objections filed by the opposing creditors, and the attention of the court is confined to the transactions stated and specified in the objections. All other transactions, to which the proofs may refer, except such as are embraced in the ob-jections, are of course laid out of the case.

1. In considering the first objection, it may be observed in the outset, that there is no evidence whatever to show that the claims of Downer were in any part fictitious, or that the sum, for which he obtained judgment, was not justly due to him. Nor is there any evidence to show that the bankrupt was not a partner of the firm of Downer, Wilkins & Co., and not liable as such for the debts. On the contrary, the objection states, in terms, that he was a partner, and as such became indebted to Downer; and from that, together with the testimony and exhibits, it must be taken, that the debts were bona fide debts, and that the bankrupt was a member of the partnership at the time they were contracted. Such, it seems, was the opinion of the bank-rupt's counsel in the suit; for Mr. Barrett says, that on learning all the facts in the case, he advised that the suit could not be defended, and that it would be proper to sub-mit to a default.

As to collusion between the bankrupt and the creditor, it is clear, that the proceedings in the suit afford no presumption whatever of any collusion between them. The bank-rupt employed counsel to appear in the suit, and instead of suffering judgment to pass at the first term, as he might, he procured a continuance. After the decree of bankrupt-cy, and before the next term of the court, there was ample time for the assignee, upon whom the duty properly devolved, to investi-gate the matter, and prepare a defence, if he found a defence would be available. The bankrupt felt unable, and was not obliged, to provide means for defending the suit; but it appears, that he made efforts to procure oth-ers in interest to do it. Failing in this, his counsel suffered a default to be entered, un-der a rule, however, that the damages should be assessed by the clerk,—evidently with a view to guard against a recovery for more than was really due.

Nor was the assent of the bankrupt to the computation of damages, if assent it can be called, given under such circumstances, as to warrant any inference of collusion on his part. The opportunity was sought to get his assent to the computation, and it is very manifest, that he was reluctant to do or say any thing in the matter. He peremptorily re-fused to sign the paper; and it was only after one of the other partners had assented to it, and after being much pressed, that he was prevailed upon to say, he should make no ob-jections. This, in any view of it, is of very little importance, especially as the assent of the other partner was alone sufficient to au-thorize the entering up of judgment for the amount against all the defendants.

As there is no evidence to impeach the jus-tice of the judgment, but rather evidence from the testimony and exhibits that the judgment was right, it is difficult to see what ground there is in the transaction for complaint against the bankrupt. There is no foundation for saying, that the act of suffer-ing a default in the suit enabled the creditor to gain an unlawful preference. It was the attachment, not the judgment, that created and gave the preference, though a recovery of judgment was necessary to render the preference available. If no property of the bankrupt had been attached, there would have been no preference. The attachment was made some months before the filing of the petition in bankruptcy, and the lien there-by acquired upon the property, if bona fide, could not be defeated or affected by any sub-sequent proceedings in bankruptcy. The creditor was legally entitled to the benefit of the lien, and the utmost that can be said is, that the default enabled him to obtain a judg-ment for his debt somewhat earlier than he might perhaps have otherwise done. But it neither gave nor secured to him any new or greater right upon the property, or any other preference, than he already rightfully possess-ed, and could have made effectual by a recov-ery of judgment, if not then, at a future time. Even a certificate of discharge, if obtained in the meantime, would not have prevented a recovery of judgment. In some cases, such as actions founded on tort, and actions sounding merely in damages, as for a breach of a con-tract of marriage, covenant, and the like, where the claims are not provable under the bankruptcy, the certificate is no impediment to a judgment. In others, where the claims are of a nature to be provable, the certificate is applicable as a bar, and in general must

operate as such; but if the plaintiff have a lien · by attachment in any such case, and the lien be saved and protected by the act, he must be entitled, on the general principles of law, as well as in reason and justice, to the necessary means to make the lien effectual. It is admitted, that the general effect given by the act to a certificate of discharge, obtained under a voluntary proceeding in bankruptcy, must be so far qualified in the case of trust or fiduciary debts, though provable under the bankruptcy, as to give the party whatever judgment, decree, or process, may be necessary to enable him to enforce his claim; and such, it would seem, must be the legal operation in the case of every other right, whether springing out of a lien, mortgage, or other security, which is saved and protected by · the act. To allow the plaintiff, in the case of a lien by attachment, to have judgment and take execution against the property attached would be giving him the benefit of his lien, and nothing more. It would be in analogy to the practice adopted in the English courts in suits against a discharged insolvent, where, upon the ·plea of a discharge under the Lords' act, judgment is rendered for the creditor and execution awarded against the future effects of the insolvent, they not being discharged, but remaining liable.

Upon the general question, whether an attachment is a lien within the saving clause of the bankrupt act, it is quite unnecessary to say anything, because the question has already been decided in the affirmative both by this court and the circuit court. It may be worth while, however, to notice here, as an instance of professed improvement in English legislation on the subject of bankruptcy, an alteration in the law of that country touching rights of an analogous character, of very recent date and of very considerable importance. By the statute 21 Jac. 1, c. 19, § 19, which formed the law in England for more than two centuries, it was enacted, that creditors, having their debts secured by judgment, statute, or recognizance, or having made an attachment according to the custom of London, where no execution or extent is served or executed before the person became bankrupt, that is, before the act of bankruptcy committed, shall not be relieved for more than a rateable part of their just debt. By the present law it is provided, that "all executions and attachments against the lands and tenements, or goods and chattels, of any bankrupt, bona fide made, executed, or levied, before the date and issuing of the fiat against him, shall be deemed to be valid, notwithstanding any prior act of bankruptcy by such bankrupt committed; provided the person or persons, at whose suit, or on whose account, such execution or attachment shall have issued, had not, at the time of executing or levying the same, notice of any prior act of bankruptcy by him committed."

2. The second objection, upon the face of it, admits, that the judgment recovered by Stephen S. Downer was right in amount; for it says, that the bankrupt consented to a judgment for an amount equal to the debts he owed Downer. The point insisted upon seems to be, that, as Downer and the bankrupt were partners in the late firm of Downer, Wilkins & Co., and the money sued for was paid by Downer in satisfaction of the partnership debts, and so on account of the joint concern, the action, though the money was paid after the partnership had expired, could not be maintained. Whether it could, or not, would depend upon the particular circumstances of the case, which do not appear; such as whether there was an express promise, or that which was equivalent to a promise. But however that might be, as the point does not appear to affect the merits of the claim, which formed the ground of the action, but goes rather to the nature and form of the remedy, it is deserving of very little consideration here. In all other respects, this objection rests upon the same circumstances, and is dependent upon the same principles, as the first; and the observations made upon that are applicable to and decisive of this, and need not be repeated.

3. The remaining objections are confined to certain payments and securities alleged to have been made and given by way of preference to certain creditors; and in reference to these it may be premised, that the payments, in order to bar the bankrupt's right to a discharge, must amount to fraudulent preferences within the meaning of the bankrupt law. What constitutes such a preference is a question, concerning which there are conflicting authorities; but the prevailing doctrine seems to be, that a payment, when it consists of an appropriation of a part only of the debtor's property, must be made in contemplation of bankruptcy, and must be voluntary. Both must concur. If it be in contemplation of bankruptcy, but not voluntary, or be voluntary, but not in contemplation of bankruptcy, it will not be a fraudulent preference. To make out a payment to be in contemplation of bankruptcy, something more must appear than mere insolvency; enough to show, if not a determination to become a bankrupt at all events, at least that bankruptcy was in view as a consequence of the insolvency; and to be voluntary, the payment must originate with the debtor, the first step being taken by him and not by the creditor.

Now, so far as concerns the payments to Baxter and Porter, there is no evidence, which will authorize the conclusion, when fairly considered, that either of them comes within the principle just laid down. Indeed, there is no proof, that any such payments were in fact made, except what comes from the bankrupt himself on his examination; and if the opposing creditor will rely upon

the bankrupt's testimony to establish the fact of the payments, he must take the explanations, which the bankrupt gives concerning them. From what is stated by him it does not appear, as to some of the payments, whether they were voluntary, or not. It appears, however, that two of them were made under the pressure of executions, which precludes the idea of voluntary payment. But as to any of them being made in contemplation of bankruptcy, the bankrupt, after stating that all the debts, except one of the two in execution, were the joint debts of himself and Hunter, and were paid out of the partnership funds, says, that he and Hunter expected to pay all their debts and relieve themselves from embarrassment, and had no other view or expectation, until he was committed to jail in July. To hold these payments to be fraudulent preferences, upon what is disclosed in regard to them, would not only be assuming what does not appear, but would be in fact at variance with what does appear.

The circumstances attending the small payment to John Downer, it is hardly necessary to say, do not make out a preference within the intent of the law. And as to the security alleged to have been given to David Moore and Hiram Moore, it appears that Hunter and the bankrupt being jointly indebted to the Moores in the several sums stated, John Downer, in consideration of the lease to him of a farm by Hunter, agreed to pay the two debts out of the produce of the farm. The legal title to the farm was in Hunter, though the bankrupt, as partner and having paid part of the purchase money, was considered as having an equal interest in it. But Hunter gave the lease, as he had the legal power to do, having the title. The concurrence of the bankrupt was not necessary to the validity of the lease; and there is no proof in the case, that he had any actual concern, or participated at all, in the transaction. The act, for aught that appears, was the separate act of Hunter alone; and whatever may be its character, it cannot be treated as the act of the bankrupt, without affirmative proof connecting him with the transaction.

As none of the objections appear to be sustained by the proofs, the objections are overruled and a discharge allowed the bankrupt. But notwithstanding such is the result upon full consideration of the testimony, it does not follow, that there may not have been good probable cause for interposing objections for the purpose of an investigation. The question of costs depends, not so much upon the final result, as upon the particular circumstances of the case; and looking to them it is not deemed equitable, in this instance, to subject the opposing creditor to the payment of costs.